ams

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 05-40164-01-JAR |
| | ) | |
| EDGAR B. BRANCH, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS IDENTIFICATION AND GRANTING DEFENDANT'S MOTION FOR DISCOVERY

This matter is before the Court on defendant Edgar Branch's Motion to Suppress Identification (Doc. 16), and Motion for Discovery (Doc. 15). On July 25, 2005, the Court held an evidentiary hearing and took both motions under advisement. Having reviewed the evidence and arguments presented by the parties, the Court is now prepared to rule. The Court grants defendant's motion for discovery to the extent the Government possesses materials that are discoverable under controlling law. Additionally, because the Court finds none of the three identifications of Branch were violative of due process, the Court will not suppress the in-court or out-of-court identifications of defendant by Nathaniel Lowder, Travis Slavens, or Officer Meier.

## I. Factual Background

On October 29, 2004, at approximately 8:00 a.m., Topeka Police Officer Mike Meier was patrolling the block of 1000 N.E. Madison Street in Topeka, Kansas when he observed a 1988 blue

Honda Accord traveling eastbound in the block of 300 N.E. Fairchild.  He observed the vehicle "nose-down" hard and then reduce its speed when he approached.  The vehicle turned into a driveway at 406 N.E. Fairchild and Officer Meier pulled his patrol car into the driveway behind it.

Officer Meier exited his patrol car and observed three occupants in the vehicle: an older white male wearing blue jeans, a black jacket, and a hat; a younger white male; and a white female.  He asked the occupants what they were doing and the older white male advised that they were checking to see if the person who lived at the residence had a trailer for rent.  Knowing personally who lived at 406 N.E. Fairchild, Officer Meier asked the occupants of the vehicle who lived there.  The occupants appeared nervous to Officer Meier at this point and he decided to call dispatch for backup.  When Officer Meier called dispatch, the older white male jumped a fence and ran from the scene.  Before the older white male ran, Officer Meier was standing 25 feet away from him for a period of about 15 seconds.  He described the man as about 5 feet 11 inches tall, weighing about 160 pounds.

After the older white male ran, Officer Meier identified the other two occupants of the car as Nathaniel J. Lowder and Tasha N. Myers.  Meiers identified the older white male as "Eddy." Officer Meier noticed at this time that the ignition switch of the vehicle had been removed.  He also noticed through an open front passenger window–where the older white male had been sitting–a soft black nylon case on the seat cushion with a shotgun protruding from it.  Soon after, Officer Meier accessed a booking photograph of Edgar Branch, who he identified as the older white male who ran from the scene.

Lowder was transported to the Topeka Police Department, where he was further interviewed.  Lowder advised that defendant, who he referred to as "Eddy," arrived at his house in the early morning

2

on October 29, 2004, asking why he had left him somewhere the previous night.[1]  Lowder gave

defendant and Meiers a ride that morning before they pulled into the driveway at 406 N.E. Fairchild.

While riding in the vehicle together, Lowder and the older white male were seated approximately three

feet from one another.  Prior to October 29, 2004, Lowder testified that they had crossed paths more

than ten times.  Lowder was shown a booking photograph of defendant, who he identified as the older

white male who ran from the scene.  At the July 25 hearing, Lowder positively identified defendant as

the man who ran from the scene and testified that he had no question that the defendant was Edgar

Branch.  He further testified that he was 100% certain that his identification both in and out of court was

accurate.

Travis Slavens testified that he met defendant in October 2004 at a friend's house in the

Oakland area of Topeka and that at that time defendant asked him for a ride.  Slavens testified that he

gave defendant a ride to his friend Alex's house and then to pick up one of defendant's friends from

work and take her home.  Slavens spent approximately six hours with the defendant on that day before

defendant took his vehicle from him.  Two days later, on October 25, 2004, Slavens filed a police

report and described the defendant to police.  On November 3, 2004, a police officer met with Slavens

to discuss the car theft.  After Slavens described to the officer the events in October, the officer showed

Slavens a booking photo of the defendant, which Slavens positively identified as "Edward Branch."  He

testified that he was very certain that this was an accurate identification, as he recognized distinctive

tattoos on the neck.  Although Slavens admitted to injecting methamphetamine the day that he spent

---

[1] Lowder admitted that he had used methamphetamine at some point before midnight the night before.

3

with defendant in October, he testified that it did not interfere with his ability to recognize and identify the defendant.

## II.  Motion for Discovery

Defendant asks the Court to order the Government to produce twelve different types of discovery in this case.  The Government responds that it has already produced the information it is required to produce under the Federal Rules and the Constitution.  The Government specifically objects to the following three discovery requests: (1) mental, physical and substance abuse examinations and evaluations on adverse witnesses; (2) prior disciplinary employment records of officers involved; and (3) any evidence in possession, custody or control of the Government which is relevant to a due process challenge under *United States v. Agurs*.[2]

The Court grants defendant's motion for discovery with regard to the first two categories of materials listed above, to the extent that they fall within the Government's duty to comply with the requirements of *Giglio v. United States*.[3]  *Giglio* requires the Government to disclose material information that may affect the credibility of a witness whose reliability may determine guilt or innocence.[4]

The Court also grants defendant's motion for discovery of evidence in accord with *Agurs*.  In that case, the Supreme Court considered whether a prosecutor has any constitutional duty to volunteer

---

[2]  427 U.S. 97 (1976).

[3]  405 U.S. 150 (1972).

[4]  *Id.* at 153-54.

exculpatory evidence to the defense, and discussed what standard of materiality applies to that duty.[5]

The Supreme Court, in the context of a motion for new trial, held that the Government's duty to

disclose exculpatory evidence is not limited to cases where the defense specifically requests such

evidence.[6]  However, the Government is only required to voluntarily produce such evidence if it

"creates a reasonable doubt that did not otherwise exist."[7]  Here, defendant maintains that *Agurs* would

allow for production of evidence regarding the police officer's choice of place and time to arrest the

defendant as it related to defendant's due process rights.  The Court finds that *Agurs* does not support

such a demand.  There, the Supreme Court upheld the decision of the lower court to deny a motion for

a new trial because, although the prosecutor had withheld evidence from defense, the evidence did not

meet the materiality standard articulated by the Court.  However, the Court will grant defendant's

request to the extent that the Government has in its possession evidence that meets the materiality test

set forth in *Agurs*.

## III.  Motion to Suppress Identification

Defendant urges the Court to suppress the out-of-court and in-court identifications by Lowder,

Slavens and Officer Meier, claiming that the procedure of using of a photographic show-up was

unnecessarily suggestive and prejudicial, denying defendant due process.  When determining the

constitutionality of pretrial identification procedure, the Court must first examine whether the procedure

---

[5]  *Agurs*, 427 U.S. at 108.

[6]  *Id.* at 110.

[7]  *Id.* at 112.

was unnecessarily suggestive.[8]  If it is unnecessarily suggestive, the Court then must determine "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive."[9]  "A pretrial identification procedure does not violate due process unless it is 'so unnecessarily suggestive that it is 'conducive to irreparable mistaken identification.'"[10]

In its response brief to defendant's Motion to Suppress, the Government states that the procedure used with the three witnesses in this case–showing them a booking photo of the defendant only–was perhaps unnecessarily suggestive under the first prong of the analysis.  The Government maintains that the identifications were nonetheless reliable so as to outweigh any suggestiveness created by the procedure.  The Court will assume without deciding that the photographic show-up procedure was unnecessarily suggestive and proceed to decide the reliability of the identifications.

In determining the reliability of the identifications, the Court will address the following five factors identified by the Supreme Court:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.[11]

Applying these factors, the Court finds that all three identifications were sufficiently reliable so as to

---

[8] *United States v. Bredy*, 209 F.3d 1193, 1195 (10th Cir. 2000) (citing *Grubbs v. Hannigan*, 982 F.2d 1483, 1489 (10th Cir. 1993) (further citation omitted)), *cert. denied*, 531 U.S. 897 (2000).

[9] *Neil v. Biggers*, 409 U.S. 188, 200 (1972).

[10] *Bredy*, 209 F.3d at 1195 (quoting *Grubbs*, 982 F.2d at 1490 (further quotation omitted)).

[11] *Neil*, 409 U.S. at 199-200.

6

outweigh any suggestiveness that may have resulted from the photographic show-up procedure employed by officers in this case.

First, all three witnesses had ample opportunity to view the defendant before making a positive identification.  Lowder had known defendant for about two years prior to the incident on October 29, 2004.  They had "run into" one another on at least ten occasions prior to that day.  Additionally, Lowder was seated approximately three feet away from defendant in the vehicle on the morning of October 29, 2004.  Officer Meier testified that he viewed the defendant from approximately twenty-five feet away for about ten to fifteen seconds; however, he was looking directly at him and there was no obstruction to his face.  Although the collar of defendant's jacket was concealing the tattoos on his neck, Officer Meier had sufficient opportunity to view both defendant's face and his clothing.  Slavens had spent six hours with defendant riding in a vehicle together in October 2004.

Second, the testimony of these witnesses shows that their attention was sufficiently focused on defendant during the time when each of them observed him.  Lowder had spent time with him in close proximity in a car and had spent ample time with him on prior occasions.  Officer Meier addressed defendant first after he pulled in behind the vehicle at 406 N.E. Fairchild, asking him what they were doing at the residence.  He was also paying close enough attention to all three occupants of the vehicle to note that they all appeared nervous when asked if they knew who lived there.  Officer Meier testified that he was looking directly at defendant's face during this encounter.  During the six-hour period of time Slavens spent with defendant in October 2004, they were in a vehicle together alone.  All of the witnesses were additionally able to recall defendant's physical appearance before viewing the booking photograph.

7

Third, Slavens and Officer Meier were able to describe defendant before looking at the photograph.  Their descriptions of his clothing were not identical only because they observed him on different days.  Both Officer Meier and Slavens accurately described defendant's approximate age, height, weight, and race.  Defendant is in fact 5 feet 11 inches in height, weighs 170 pounds and is 33 years old.  (Ex. 400.)  Furthermore, although Lowder admitted to consuming methamphetamine the night before the crime, there is no evidence that his perception of the defendant the next morning could not be reliable as a result.  Likewise, although Slavens admitted to consuming methamphetamine, he stated unequivocally that it did not impair his ability to recognize the defendant as the man who took his vehicle.

Fourth, all three witnesses demonstrated a high level of certainty when confronted with both the show-up photograph and the in-court identifications.  Lowder described that there was "no question" the photograph was Edgar Branch–the same man who fled from the scene on October 29, 2004.  He stated that he is "100% sure" that his identification both then and now is accurate.  Officer Meier testified that viewing the booking photograph "confirmed" his belief that the man who ran was Branch.  Slavens stated that he was "very certain" that the identification was accurate and pointed out that he could see the tattoos on defendant's neck in the photograph.

Finally, all three witnesses viewed the photographs within short proximity of "the crime," or when they last saw defendant.  Lowder and Officer Meier identified defendant on the same day as the crime.  Slavens identified defendant within one week of the car theft.  He reported the car stolen on October 25, 2004, at which time he described defendant to police.  He was shown the photograph of Branch on November 3, 2004.  Certainly, Branch's appearance would have still been fresh in his mind

ten days after his vehicle was stolen.[12]  Under the totality of circumstances, considering all of the above-enumerated factors, the Court finds that all three identification procedures contained sufficient evidence of reliability.  Therefore, there is no substantial likelihood of misidentification.  Because the out-of-court identifications are sufficiently reliable, there is no threat that any in-court identification by these witnesses would be tainted.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion to Suppress (Doc. 16) is **DENIED.**

**IT IS FURTHER ORDERED BY THE COURT** that defendant's Motion for Discovery (Doc. 15) is **GRANTED.**

IT IS SO ORDERED.

Dated this__8th__ day of August 2005.

 S/ Julie A. Robinson_____
Julie A. Robinson
United States District Judge

---

[12] *See Neil*, 409 U.S. at 201 (finding reliability present even though seven months passed between the crime and the victim's identification of the defendant); *United States v. Thody* , 978 F.2d 625, 629-30 (10th Cir. 1992) (finding reliability when one week passed between the crime and the confrontation), *cert. denied*, 513 U.S. 907 (1994).